129 F.3d 1268
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Sorin STAN, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 97-1965.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 1, 1997.
Decided Oct. 27, 1997.
 
 Before POSNER, Chief Judge, ESCHBACH and COFFEY, Circuit Judge.
 
 ORDER
 
 1
 Sorin Stan, a Romanian citizen, entered the United States in November 1990 with authorization to remain until May 2, 1991. In December 1990 he applied for asylum and in November 1994 the Immigration and Naturalization Service (INS) office denied his application The following month, the INS initiated deportation proceedings. In December 1995 the immigration judge (IJ) denied Stan's second application for asylum and withholding of deportation and allowed him to voluntarily depart the country The Board of immigration Appeals (BIA) upheld the decision of the IJ and dismissed Stan's appeal in August 1996 Stan appeals, contending that the BIA erred in determining that he had not met his burden of demonstrating past persecution or a well-founded fear of future persecution based on his religious beliefs We affirm.
 
 
 2
 Stan is from Crajova, Romania and is a practicing member of the Christian Assembly of Gospel Church. In Romania, Stan attended high school where he studied electronics. He testified that he was "humiliated" and "verbally abused" by his teachers who gave him bad grades because his brother had left Romania illegally and because he was Christian Stan graduated from high school in 1989 and hoped to obtain a position in electronics but was assigned by the placement office at his high school to work in a coal mine. Stan stated that no other students from his high school were assigned to work at the mine and asserted that the job was assigned to him as punishment for espousing his Christian beliefs. Stan turned down the coal mine position and several months later began work as an electronics technician at his father's place of employment.
 
 
 3
 Before beginning work as an electronics technician, Stan received a notice that he would be drafted into the Romanian Army. During his initial military interview, Stan testified that he was interrogated by a military person, a police officer, and a member of the Romanian secret police (the Securitate), all of whom asked about his family in both the United States and Romania, about whether he wanted to leave Romania, and about his religion. He received instructions in September 1989 that he was to report to the chemical factory in Brasov City in February 1990, however, the assignment was canceled due to the intervening revolution in December 1989. Stan obtained a passport and left for the United States in November 1990. He has not yet fulfilled his mandatory term with the Romanian Army. Stan testified that relatives still living in Romania have told him that he has been sent notices from the Romanian Army stating that he would "suffer the loss" if he did not report to duty. He stated that he fears that if he returns to Romania, he will be forced to serve his term in the Army and that he will be assigned to the "worst" and most "dangerous" place because he has not yet fulfilled his military service obligation He also testified that he feared returning to Romania because he will likely be viewed as a traitor for leaving his homeland.
 
 
 4
 In addition, Stan states that he was persecuted on the basis of his religion. As part of his religious duties in the Christian Assembly of Gospel Church, Stan "preaches" about his religion in the streets He testified that while in Romania, he was forbidden from preaching and one day was chased by the police for preaching on the street On that occasion, he was not apprehended nor has he ever been arrested for preaching or practicing his religion. He also testified that although he was able to attend church regularly even before the revolution, he fears that he will not be able to do so if he returns because of the pressure from the Eastern Orthodox Church to prevent other religions from practicing.
 
 
 5
 The IJ concluded that Stan's testimony lacked credibility because it was "general and vague in nature." The IJ determined that Stan had neither met his burden of demonstrating past persecution nor shown a well-founded fear of future persecution, and thus denied the application for asylum and granted voluntary departure On appeal, the BIA agreed with the IJ and dismissed the appeal.
 
 
 6
 Stan asserts that the IJ erred in denying asylum on the ground that he is not a refugee We review decisions regarding the status of an applicant as a refugee deferentially and will uphold the factual determination of whether an applicant is a refugee if it is supported by "reasonable, substantial, and probative evidence" on the record. Dobrican v. INS, 77 F.3d 164, 167 (7th Cir1996) In order to qualify for asylum an alien must qualify as a refugee under 8 U.S.C. § 1101(a)(42). Krastev v. INS, 101 F 3d 1213, 1216 (7th Cir1996). A refugee is defined as a person who is unable or unwilling to return to his country of origin "because of [past] persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1 101(a)(42). The alien bears the burden of proving his status as a refugee. 8 C.F.R. § 208.13(a); Milosevic v. INS, 18 F.3d 366, 370 (7th Cir.1994).
 
 
 7
 "To establish a well-founded fear of persecution, an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable." Bereza v. INS, 115 F.3d 468, 472 (7th Cir.1997). Stan has failed to make such showing. He asserts that he fears returning to Romania because he will have to serve in the military and he will be assigned an unfavorable position due to his failure to report to service earlier. However, Stan does not argue that he failed to enter the military due to his religious beliefs. He was notified that he would be required to fulfill his obligatory term in the Romanian Army; yet he chose to leave the country before doing so.
 
 
 8
 Further, both the IJ and the BIA noted the State Department report stating that the conditions in Romania have improved significantly since Stan left in 1990. Changed political and social conditions are among the most relevant factors in evaluating the reasonableness of one's fear of persecution. Mitev v. INS, 67 F.3d 1325, 1332 (7th Cir.1995). The IJ's and the BIA's conclusion that the political and religious environments in Romania have changed is supported by substantial evidence.
 
 
 9
 In addition to arguing that he has a well-founded fear of future persecution, Stan may attempt to receive refugee status by showing that he suffered persecution in the past. Marquez v. INS, 105 F.3d 374, 379 (7th Cir1997) However, because Stan has failed to demonstrate a well-founded fear of future persecution, he must have "compelling reasons for being unwilling to return" to Romania. 8 C F R § 208 13(b)(1)(ii); see also Bucur v. INS, 109 F 3d 399, 405 (7th Cir.1997) Although Stan asserts that he was chased by the Romanian police because he was preaching his religious beliefs, being chased once does not constitute persecution, particularly when the record does not indicate that he was arrested, prosecuted, or imprisoned for his religious beliefs. See Mitev, 67 F 3d at 1330 Further, the fact that he was permitted to attend church freely undermines any claim that he was persecuted in the past as a result of his religion
 
 
 10
 In addition, Stan's claim that he was "humiliated" and treated poorly by teachers at school as a result of his religious beliefs and his brother's illegal flight from Romania does not rise beyond the level of harassment or discrimination. Anton, 50 F.3d at 472. Further, his attempt to demonstrate past persecution by stating that he was assigned a job in a coal mine rather than in the field of electronics is belied by the fact that he was not punished in any way for failing to accept the assignment in the coal mine and by the fact that he ultimately'obtained a position as an electronics technician. See Bucur, 109 F 3d at 402
 
 
 11
 The BIA's decision is supported by substantial evidence. Stan has failed to show that the treatment to which he was subjected in Romania rises to the level of past persecution or that it establishes a well-founded fear of future persecution.
 
 
 12
 DECISION AFFIRMED AND PETITION FOR REVIEW DENIED.